Filed 7/15/14  In re Joshua K. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JOSHUA K., a Person Coming Under the Juvenile Court Law. | B250731<br>(Los Angeles County<br>Super. Ct. No. CK88359) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PEDRO Y.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

Presumed father Pedro Y. appeals from the juvenile court's orders sustaining jurisdiction over his child, Joshua K., under Welfare and Institutions Code section 300, subdivision (b),[1] and removing Joshua from his custody. We reject Pedro's contention that there is insufficient evidence to support the orders. We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Joshua was born to Misty K. (Mother) and Pedro Y. (Father) in May 2011. At all relevant times herein, Father was married to another woman, C.Y. (Mrs. Y.). Mother primarily lived in a recreational vehicle ("RV") located on the property of Charles M., known as "Bob." Charles M. was not related to Mother, but she considered him a father figure and referred to him as her "dad."[2]

1. *Joshua is detained from Mother and placed with Father.*

Joshua first came to the attention of the Los Angeles County Department of Children and Family Services (the Department) shortly after his birth because he was born with a positive toxicology screen for methadone. On August 25, 2011, the juvenile court sustained a non-detained section 300 petition that alleged Joshua was endangered due to Mother's substance abuse and mental health problems. Mother had a 20-year history of substance abuse; was a current abuser of heroin and alcohol; had abused both substances while she was pregnant with Joshua; and had suffered four convictions for driving under the influence and two narcotics-related convictions. She also had a history of mental and emotional problems including a diagnosis of bipolar disorder, and had failed to take her prescribed psychotropic medications. Joshua was released to Mother and Father, with Mother being the primary caretaker. On February 23, 2012, the juvenile court terminated jurisdiction.

On October 24, 2012 the Department filed another section 300 petition alleging under subdivisions (a) and (b) that Joshua was at serious risk of physical harm, and

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

2

Mother had failed to supervise or protect him. The petition alleged that: (1) in Joshua's presence, Mother engaged in a violent altercation with Father and kicked him in the mouth, loosening Father's tooth; (2) continued to abuse alcohol despite the court's order that she participate in a substance abuse program; and (3) on October 20, 2012, drove a vehicle with Joshua as a passenger while she was under the influence of alcohol and prescription medication. As a result of the latter incident she was arrested for child endangerment and driving under the influence. Additionally, Mother had been diagnosed with anxiety, bipolar disorder, and post-traumatic stress disorder.

In a Detention Report dated October 24, 2012, the Department expressed concern that Father had a history of failing to cooperate with the Department, demonstrating instability and a lack of effort in caring for Joshua's basic needs and welfare. Father had prior convictions for driving under the influence, inflicting corporal punishment on a spouse, receiving stolen property, cruelty to an animal, and charges relating to cock fighting.

At an October 24, 2012 detention hearing, the juvenile court found a prima facie case for detaining Joshua under section 300, subdivisions (a) and (b). The court ordered him released to Father pending the adjudication hearing, and ordered Father to "immediately participate in [Al-Anon] with a sponsor." The court ordered family maintenance services. It ordered monitored visits for Mother with Joshua in a neutral setting, with someone other than Father to act as the monitor.

A Jurisdiction/Disposition Report dated December 12, 2012 noted that the Department had received two referrals since the October hearing. One alleged that Father "brings the child to the mother's location of residence on a daily basis and relies on the mother to care for the child while he works on cars outside the home" and that Mother "uses alcohol to excess and is a daily user of Heroin." A second referral alleged that on November 4, 2012 Mother and Father were together at Mother's RV and were under the influence of alcohol; "the parents started a fire in the yard that was not contained and the child Joshua was not being properly supervised near the fire." Father "tried to leave with the child and the mother was heard yelling at the father not to drive while intoxicated

3

with the child in the car." The reporting party saw Father leave the premises with Joshua in the car.

In an interview with the Department's social worker, Mother explained the incident in which she had kicked Father's teeth as follows. She had been arguing with Charles M.'s daughter. Father, believing Mother was upset, tried to prevent her from leaving with Joshua in the car. Father had been drinking and Mother did not want him to be with Joshua. This was the only time Mother had ever seen Father under the influence of alcohol or drugs.

In his interview with the social worker, Father stated that he was retired, but owned an auto body shop that he was operating on Charles M.'s property. Father made a variety of statements indicating he did not have concerns about Mother's ability to care for Joshua. He wished to see Joshua released to her and asked if the Department could give Mother " 'more time.' " He could not afford a babysitter. He denied any history of alcohol or drug abuse, but admitted he would have "one or two beers after he changes" Joshua. He also admitted to suffering "a DUI" five or six years previously.

The Department's report expressed concern about releasing Joshua to Father. In the December 12, 2012 Jurisdiction/Disposition Report, the Department opined that Father "does not understand the severity of the problem" and was allowing Mother unmonitored contact with Joshua. Father had "continually asked whether the child can be released to the mother and given that the father works on the property where the mother lives, it appears likely that the father brings the child with him during the day while he is working at the Mother's." The Department was also concerned about Mother's continuing heroin use: on November 13, 2012, a Department social worker observed a man on Charles M.'s property using heroin intravenously. The Department recommended against releasing Joshua to Father given that he was apparently "not protecting the child from the mother."

At an adjudication hearing on December 12, 2012, the court found the allegations in the petition true. It found by clear and convincing evidence that Joshua was in danger and there was no reasonable means to protect him without detaining him from Mother.

4

The court ordered, as a permanent plan, that Joshua be placed with Father. It ordered family maintenance services for Father, enhancement services for Mother, and monitored visits for Mother in a neutral setting, with the proviso, "FATHER IS NOT TO MONITOR MOTHER'S VISITS." Father was further ordered to participate in counseling and attend Al-Anon meetings.

### 2. *Joshua is detained from Father.*

#### a. *Mother's March 6, 2013 overdose and referral from her neighbor.*

On March 6, 2013, the Department received a referral from a neighbor of Mother's, who reported that Mother was still using heroin and abusing prescribed drugs, and had been taken to the hospital by paramedics earlier that day. The caller also averred that, although Joshua had been detained from Mother, Father "leaves the child with [M]other sometimes while he goes to work." The caller had seen Joshua walking outside in the streets by himself when Mother was inside the RV. On March 4, 2013, Joshua had been with Mother from 10:00 a.m. until 5:00 p.m. While Joshua was playing outside unsupervised, a homeless man took him back inside Mother's RV. According to the caller, the neighborhood was unsafe and "anyone can take the child and do something to him." The caller claimed to have seen Father drinking and then driving away from Mother's residence with Joshua inside the car.[3]

#### b. *Social workers' visit to Father's home.*

Apparently in response to the referral, two Department social workers arrived at Father's home on the evening of March 6, 2013 for an unannounced visit. Father's house was cluttered but clean; the utilities were working; there was plenty of food; there were no hazardous living conditions; and there was no alcohol in the refrigerator or visible in the house. Joshua was sleeping, was appropriately dressed, and seemed to be developing according to his age. He had a round bruise on his forehead and dried bedbug bites on his legs. The social workers interviewed both Father and Mrs. Y.

---

[3] As noted *post,* the juvenile court sustained Father's section 355 objection to admission of the caller's statements.

(i) *Interview with Mrs. Y.*

Mrs. Y. related the following. She and Father had been married for 35 years and had three grown children together who no longer lived at home. She loved Joshua despite the fact he was the child of her husband's mistress, and made sure all Joshua's needs were met. While she was initially uncomfortable with the situation because it reminded her of Father's mistress, she knew this was not Joshua's fault. Joshua was very attached to her and called her " 'mama.' " Father was still in contact with Mother on a regular basis.

Mrs. Y. worked as a nurse's assistant from 6:30 a.m. until 2:30 p.m. and returned home by 3:00 p.m. each day. Father cared for Joshua while Mrs. Y. was at work. Mrs. Y. served as Joshua's primary caretaker as soon as she arrived home from work each day. Father no longer worked so he could take care of Joshua. When Mrs. Y would come home for lunch, Father and Joshua were always there. She had never found Father drinking alcohol when he was caring for Joshua. As far as Mrs. Y. knew, Father did not take Joshua to Mother's residence. Father took good care of Joshua.

When Mrs. Y. arrived home at 3:00 p.m. on March 6, Father left Joshua with her and went to visit Mother in the hospital. Father returned home after 5:00 p.m. and had "a few beers." Father told Mrs. Y. that earlier that day, a man had called and informed him Mother was dying. Father therefore went to Mother's house, taking Joshua with him. Father told Mrs. Y. that he called the paramedics because Mother was on the floor, wanting more pills.

Mrs. Y. did not believe Father had a "problem with alcohol." Years before, Father used to drink, but he "got a DUI and completed a program." At the time of the interview, Father typically drank "a couple of beers two times per week" and some weeks, not at all. Father did not get drunk. When he drank, Mrs. Y. was home and watching Joshua. She stated that Father becomes "a little 'loud' when he drinks a lot," but does not become aggressive. He did not drive after drinking, and did not drive with Joshua while under the influence.

6

(ii) *Interview with Father.*

When the social workers interviewed Father that evening, they observed a "soft alcohol odor" on his breath. They believed Father was under the influence of alcohol during the interview. Father explained that at approximately 1:00 p.m. that day, Charles M. called and told him Mother "was dying and to go and see her." Father, worried, went to Mother's residence, taking Joshua with him because he could not leave Joshua alone at his house. On the way to Mother's residence, Joshua fell asleep. Upon arrival at Mother's, Father left the car in the driveway with Joshua asleep inside. Charles M. watched the car while Father went inside. Mother was lying on the RV floor, naked, reaching for bottles of medicine. Father refused to give Mother more and took the bottles away. Mother's body was shaking and "she seemed really sick." Father offered to take Mother to the doctor but she refused. He dressed Mother and called paramedics. When the paramedics arrived it was almost 3:00 p.m. Joshua slept in the car "the entire time." Father then returned Joshua to Mrs. Y.'s care at their home. Father explained he had taken Joshua to Mother's residence because it was an emergency and "family is always first." He denied taking Joshua to Mother's residence while he worked and claimed the caller who made the referral was a liar.

When Father arrived home after the hospital visit he drank two " 'Cobra' " beers. He denied having an alcohol problem or driving while intoxicated with Joshua in the car. He had abused alcohol in the past, but no longer; years before he was arrested for DUI and completed a program. He drank a "couple of beers" sometimes but not every day. He believed he did "not need programs" or Al-Anon classes. He claimed that after the court's order, he went to "a couple" of Al-Anon classes but did not recall the location. According to the Department's report, Father had failed to provide information showing he had attended Al-Anon classes as ordered by the court.

c. *Placement of Joshua in protective custody.*

The social workers determined Joshua needed to be placed in protective custody and summoned police officers to assist in his removal. Father became "verbally abusive and aggressive" when informed Joshua was being taken into protective custody for

7

general neglect. He again denied taking Joshua to Mother's residence. Father accused the social workers of being "bad persons" and said, " 'People go crazy like the man that killed all the Police Officers,' " and if Joshua was taken away, " 'I can go crazy too.' " Father denied he was thinking of hurting himself or others. He told the social workers to " 'go and fuck yourselves.' " When the Los Angeles Police Department (L.A.P.D.) officers attempted to calm Father, he became verbally abusive and challenged them to fight.[4]

d. *The subsequent petition, detention, and adjudication hearings.*

(i) *The subsequent petition.*

On March 11, 2013, the Department filed a subsequent petition pursuant to section 342,[5] alleging that Father had failed to adequately supervise or protect Joshua. It alleged three grounds in support: (1) Father had "a history of alcohol abuse and is a current abuser of alcohol," rendering him incapable of providing Joshua with regular care and supervision. On March 6, 2013, Father was under the influence while Joshua was in his care and under his supervision. Father had failed to regularly participate in Al-Anon meetings as ordered by the juvenile court. (2) On March 6, 2013, Father left Joshua alone in a vehicle without adult supervision while Father visited with Mother. (3) Father had allowed Mother to visit Joshua and Father monitored Mother's visits, in contravention of the juvenile court's order.

A "last minute" report dated March 11, 2013 related that Mother had left the hospital on March 6, 2013, prior to her psychiatric evaluation and against medical advice.

---

[4]     Father said: " 'Take your gun off and I'll fight you outside asshole. Come on motherfucker. I'll fight you. You fuckers that's why people kill all of you. Come on shoot me motherfuckers. Fuck all of you fucks. Take out your guns and shoot me. Fuck you fuckers. Remove your guns. Remove them you fucks.' "

[5]     A subsequent petition may be filed under section 342 when dependency jurisdiction has been established, and the Department alleges new facts or circumstances that warrant the continuation of jurisdiction. (*In re Victoria C.* (2002) 100 Cal.App.4th 536, 542.)

She told a social worker on March 11, 2013, that she had " 'supersonic vision' " and hearing, facts which she claimed the L.A.P.D. could confirm. She had been "hearing people talking for days." Mother's speech was slurred and unfocused. The social worker opined that Mother was under the influence of some substance. Mother's therapist told the social worker that Mother had not been attending her group therapy class, nor had she visited the clinic where she was to obtain methadone treatment.

At a detention hearing on March 11, 2013, the juvenile court found there was a prima facie case for detaining Joshua from Father pursuant to section 300, subdivision (b), and ordered Joshua detained from Father pending the adjudication hearing. (§§ 319, 342.) It ordered family reunification services for the parents.

(ii) *The adjudication.*

A contested adjudication hearing transpired on May 20, 2013.[6] Father, Mother, and Charles M. testified. The juvenile court sustained Father's section 355, subdivision (c) objection to statements made by Mother's neighbor in the March 6, 2013, referral.[7]

Father testified that on the date Mother overdosed, Charles M. called and reported that Mother was shaking and Charles M. "didn't know if she was going to die or what."

---

[6]    The adjudication initially commenced on April 17, 2013. However, due to problems with the Tagalog interpreter's services for Father, the juvenile court declared a mistrial.

[7]    Section 355 provides that, absent various exceptions not present here, if a party raises a timely objection to the admission of specific hearsay evidence contained in a social study, that hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based. However, the fact a section 355 objection is sustained does "not render those statements inadmissible." (*In re B.D.* (2007) 156 Cal.App.4th 975, 984.) Rather, the objection means that uncorroborated, the hearsay statements do not constitute substantial evidence and cannot be used as the exclusive basis for finding jurisdiction under section 300. (*In re B.D.*, at p. 984; see *In re Lucero L.* (2000) 22 Cal.4th 1227, 1244-1245.)

Father told Charles M. to call 911, but Charles M. "did not know what to do." Father drove to Mother's residence to see what the problem was. He took Joshua with him because Mrs. Y. was at work. Father "peeped" through Mother's open RV door, keeping Joshua in view at the same time. He saw she was shaking and could not get up. He put Joshua on his lap and called 911. He, Joshua, and Charles M. waited outside the RV for the paramedics, who arrived shortly. Father denied taking Joshua for visits with Mother or monitoring visits between them. He admitted drinking "once in a while but not every day," and did not drink when Joshua was alone with him. He explained, "I just drink one or two when I eat in the evening," when Mrs. Y. was home. He was attending a 12-step program, and had given Mother—whom he referred to as his "mistress"—documentation of his attendance to give to the social worker. He denied talking to Mother often, but answered her calls when she telephoned him. When asked whether he ever saw Mother apart from Joshua, he replied: "It's like this. In the yard of her father, that's where my other vehicles are parked. If I go there and see her, just to get my vehicle. But I don't purposely go there to see [Mother]." He went to Charles M.'s on weekends, when Mrs. Y. was home and could look after Joshua. He explained, "if it's damaged, I buy a car, and I park it there." However, he did not have a business there. Charles M. was "a long time friend. He allows me to park cars or vehicles there. And when I get the vehicle, I bring it home, and I have time to fix them."

A Last Minute Report stated that as of May 7, 2013, Father had not provided any documentation of his attendance at a 12-step program; he denied knowing he needed to attend one.

Mother testified that Father "comes over to work on cars" on Charles M.'s property, but not to visit her. He "used to have a body shop" and worked on the side for money; however, since Joshua had been placed with him, his work had slacked off and he mostly worked on the cars on weekends. Father did not bring Joshua with him on those occasions, and he had never acted as a monitor for Mother's court-approved visits. She and Father had a cordial relationship, and she was no longer his mistress. She believed that Charles M. was "in [the] early stages of Alzheimer's. He's very old."

10

A Last Minute Report stated that on April 26, 2013, a Department social worker spoke to Mother on the telephone. Mother kept screaming into the phone. She denied being under the influence or screaming, explaining that her supersonic hearing made her sensitive to noise, and she could hear sounds others cannot.

Charles M. testified that on the date of Mother's hospitalization, she "didn't look right." She had a "[s]eizure or something" and he "wanted to make sure she's all right," so he called Father. He did not call 911, but should have. Father sometimes brings Joshua over to Charles M.'s property when Father "works over there." Father always brings two or three workers with him, and they watch Joshua.

(iii) *The juvenile court's ruling.*

The juvenile court found by a preponderance of the evidence that Joshua was a person described by section 300, subdivision (b), and the allegations in the section 342 petition were true. It reasoned: "The father changes his story repeatedly. He tells the worker that that night he was so stressed out he went home and had a couple of drinks. He tells me he didn't drink anything. He says that he goes over to work on his car. He says he doesn't take the kid there. He says he does take the kid there. The grandfather says he's taking the kid there, but workers were watching the child. This is the same residence where the mother resides. [¶] The date of the incident—the stepmother says the father drinks to excess, that he gets loud when he drinks. And the night of the incident, the father is using profanity with the worker and challenging police officers."

In regard to the disposition, the court considered the same evidence and took judicial notice of "sustained petitions, minute orders, and disposition case plans in the court file." It found by clear and convincing evidence that remaining in Father's home would pose a substantial danger to Joshua's physical health, safety, protection, or well-being; there were no reasonable means other than removal to protect him; and reasonable efforts had been made to eliminate the need for removal. It ordered that Joshua remain a dependent child of the court under section 300, subdivisions (a) and (b); placed Joshua in the care and custody of the Department for suitable placement; ordered family reunification services for both parents; ordered Father to complete a Department-

11

approved alcohol program; and ordered twice weekly monitored visits with Joshua for Father, with discretion to liberalize.

DISCUSSION

1. *Substantial evidence supports the juvenile court's jurisdictional findings.*

Father first contends there was insufficient evidence to support the juvenile court's order sustaining jurisdiction under section 300, subdivision (b). We disagree.

a. *Standard of review.*

Section 300, subdivision (b) provides in pertinent part that a child may be adjudged a dependent of the court when "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child," or when the child's parent or guardian is unable to "provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (See *In re A.G.* (2013) 220 Cal.App.4th 675, 683.)

We review a juvenile court's jurisdictional findings under the substantial evidence test. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.) Proof by a preponderance of the evidence is required. (§ 355; *In re Noe F.* (2013) 213 Cal.App.4th 358, 366; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 198.) We must uphold the court's findings "unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]" (*In re Veronica G.*, at p. 185; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We do not weigh evidence, resolve evidentiary conflicts, or assess witness credibility, but defer to the juvenile court on these issues. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.) Evidence from a single witness can be sufficient. (*In re Alexis E.*, at p. 451.)

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." *(In re Rocco M.* (1991) 1 Cal.App.4th 814, 824; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) "Thus previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur." *(In re Ricardo L.*, at p. 565.) A juvenile court is not required to wait until a child is actually hurt before it assumes jurisdiction. *(In re I.J., supra,* 56 Cal.4th at p. 773.)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the . . . court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." *(In re Alexis E., supra,* 171 Cal.App.4th at p. 451; *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) However, we generally exercise our discretion to reach the merits of a challenge to any jurisdictional finding when it could potentially impact current or future dependency proceedings or have other consequences for appellant. *(In re Drake M., supra,* at p. 762.)

Here, substantial evidence supported each of the three bases alleged in the subsequent petition.

b. *The evidence supported the court's finding that Father was allowing Mother unmonitored contact with Joshua.*

There was substantial evidence supporting the allegation that Father was, at the time of the May 20, 2013 adjudication, allowing Mother unmonitored visits with Joshua, and that such access posed a danger to him. There is no dispute that Mother was unable to care for or supervise Joshua, given his tender years. Mother was a regular abuser of heroin, and her mental health and substance abuse issues made it dangerous for Joshua to be in her care. Among other things, Mother's statements about possessing supersonic

13

hearing and vision, and hearing voices; her failure to attend her group therapy classes or clinic appointments; her continued use of heroin at her RV; and her March 6 overdose all demonstrated her deteriorating mental state and her inability to safely care for her son. (See *In re Rocco M., supra,* 1 Cal.App.4th at p. 824 [jurisdiction under section 300, subdivision (b) is proper when a child is of such tender years that the absence of adequate supervision and care poses an inherent risk to his or her physical health and safety].)

Before Joshua was detained from Mother, Father told a Department social worker that he owned an auto body shop that he operated on Charles M.'s property, where Mother's RV also was located. In late October 2012, the Department was informed that Father brought Joshua to Mother's RV on a daily basis, and relied on her to care for Joshua while he worked on cars outside the home. Also in October, Father told a social worker that he lived both with Mrs. Y. at their address, and with Mother at Mother's address. Mother told a social worker that Father stayed at Charles M.'s home when Mrs. Y. was angry with him. Another referral alleged that on November 4, 2012, Father, Mother, and Joshua were together at her RV when the parents started an uncontained fire in the yard and failed to adequately supervise Joshua near the fire. In November 2012, Father informed a Department social worker that he could not afford a babysitter.

There was substantial evidence Father continued taking Joshua to Mother's home even after Joshua was detained from her on December 12, 2012. On March 6, 2013, the Department received a referral alleging that Father would sometimes still leave Joshua with Mother when he worked, and that on March 4, 2013, Joshua was left in Mother's care from 10:00 a.m. until 5:00 p.m. Because the court sustained Father's section 355 hearsay objection to the referral, the caller's allegations were not sufficient by themselves to support the court's jurisdictional finding or any ultimate fact. However, the referral was largely corroborated by other evidence and may therefore be considered.[8] (See *In re*

---

[8] There does not appear to be corroboration in the record for the caller's assertion that on that date, Joshua was unsupervised and was returned to Mother's RV by a homeless man. Accordingly, we do not consider this allegation in the substantial evidence calculus.

*Christian P.* (2012) 208 Cal.App.4th 437, 447-448; *In re B.D., supra,* 156 Cal.App.4th at p. 984 [corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred; it may be sufficient even though it is slight and entitled, when standing by itself, to little consideration].) Charles M. testified at the May 2013 adjudication that Father sometimes would bring Joshua to his property while working on cars, and that Father's workers would watch Joshua. Mother testified that Father did come over to Charles M.'s property to "work on cars." Father admitted he still had vehicles parked at Charles M.'s property. Moreover, there was evidence Father was still involved with Mother: he was the person Charles M. called when she overdosed, and rushed to her side; he purportedly gave her documents to pass on to the social workers; and Mrs. Y. acknowledged Father was in regular contact with Mother. While Mother and Father denied that Father brought Joshua to Mother's residence, and Mrs. Y. had no knowledge of such visits, the court was not obliged to credit this testimony in light of Charles M.'s testimony and the inconsistencies in Father's testimony.

Given Father's continued auto repair work on the same property where Mother resided, his earlier statement that he could not afford a babysitter, and evidence that he sometimes brought Joshua with him while fixing the vehicles, the court's conclusion that Father was still allowing Mother unmonitored visits with Joshua in contravention of the court's orders, endangering Joshua, was supported by substantial evidence. (See *In re S. O.* (2002) 103 Cal.App.4th 453, 461-462 [a parent's past conduct may be probative of current conditions if there is reason to believe the conduct will continue]; see also *In re J.N.* (2010) 181 Cal.App.4th 1010, 1025.)

c. *Evidence Father left Joshua alone in the parked car for a substantial period of time.*

The evidence was likewise sufficient to establish Father left Joshua in the car in an unsafe manner while he tended to Mother after she overdosed. There is no dispute that Father took Joshua to Mother's home after receiving the telephone call from Charles M. Father told the social workers that Charles M. called him at 1:00 p.m. to alert him to

15

Mother's distress. Father then made the five-minute trip to Mother's residence with Joshua and left the child in the parked car while he tended to Mother. He told a social worker that paramedics arrived at approximately 3:00 p.m. From this evidence, the juvenile court could conclude Joshua was unsupervised in the car, in the middle of the day, for at least an hour and a half. Given Father's contradictory stories to the social workers and at the adjudication, the court was not obliged to credit his testimony that he simply "peeped" in the RV, or his statements that Charles M. watched the car while Father was inside the RV. (See *In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [issues of fact and witness credibility are the sole province of the trier of fact].) Moreover, Mother believed Charles M. was suffering from the beginning stages of Alzheimer's, and he was unable to appropriately address the situation by calling 911 when Mother overdosed. The court could have reasoned that leaving Joshua in the car with only Charles M.'s supervision was inadequate.

Father contends that even if his conduct on March 6 posed a risk to Joshua, the situation was unique and unlikely to recur. But given Mother's substance abuse and mental health problems, it is readily foreseeable that Mother may be in distress in the future and again call upon Father for immediate aid. In any event, Father's conduct of taking Joshua with him demonstrates questionable judgment in regard to his care and supervision of the child, and violated the court's previous order. Mother was certainly in need of medical attention, but that did not necessitate Father's visit. Father could simply have called for an ambulance upon receiving Charles M.'s telephone call, or at the very least immediately after arriving at Mother's RV and discovering her on the floor. Father had no medical training. There was no reason he needed to tend to Mother inside the RV for an extended period before telephoning 911. This was not the sort of emergency that could have justified leaving Joshua in the car for even a brief period. While perhaps insufficient on its own to demonstrate a failure to protect, when coupled with the other sustained allegations the March 6 incident tends to support the jurisdictional finding.

16

d. *The alcohol-related allegation.*

Finally, there was substantial evidence supporting two of the three allegations regarding Father's alcohol abuse. A parent's use of alcohol, without more, does not bring a minor within the jurisdiction of the dependency court. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) However, where a child is of "tender years," a finding of substance abuse is prima facie evidence of a parent's inability to provide regular care, resulting in a substantial risk of harm. (*In re Drake M., supra,* 211 Cal.App.4th at pp. 766-767; *In re Rocco M., supra,* 1 Cal.App.4th at p. 824.)

The subsequent petition alleged, regarding Father's alcohol abuse: "The child Joshua [K.'s] father . . . has a history of alcohol abuse and is a current abuser of alcohol which renders the father incapable of providing the child with regular care and supervision. On 3/6/13, the father was under the influence of alcohol, while the child was in the father's care and supervision. The father failed to regularly participate in Juvenile Court ordered Al-Anon meetings. The father's substance abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger."

Father argues that there was insufficient evidence to show he was under the influence of alcohol when Joshua was in his care on March 6, 2013. We agree. He testified that he did not have anything to drink until after Mrs. Y. was home caring for Joshua, at which time he had two beers. The social workers who visited the home that evening believed he was intoxicated. Thus, the evidence is sufficient to show Father was intoxicated that night. However, no evidence other than the referral showed Father was intoxicated earlier in the day when he was solely responsible for Joshua.

However, there was evidence to show Father became intoxicated while caring for Joshua on other occasions. Father had suffered a conviction several years earlier for driving under the influence. Father admittedly still drank in the afternoons or evenings when Mrs. Y. arrived home. Mrs. Y. stated that Father became loud when he "drinks a lot." When social workers interviewed Father on the evening of March 6 they smelled alcohol on his breath and believed he was intoxicated. His hostile and threatening

17

conduct toward the officers and social workers also suggested he was under the influence. A referral alleged that on November 4, 2012, Father was intoxicated at Mother's residence, and the parents started an uncontained fire in the yard with Joshua present. The referral also alleged that Mother yelled at Father not to drive Joshua while intoxicated, but Father drove off with Joshua in the car anyway. Mother explained that in the earlier incident in which she had kicked Father, he had been drinking and she did not want Joshua with him under those circumstances. The March 6, 2013 referral alleged that Father had driven away from Mother's house with Joshua in the car after he had been drinking. This evidence, considered together, was sufficient to show Father repeatedly was intoxicated while supervising or driving Joshua, putting Joshua at a specific, defined risk. Driving a vehicle while intoxicated, with a toddler inside, is physically hazardous and would put Joshua at risk of physical harm. (See generally *In re Drake M., supra,* 211 Cal.App.4th at p. 766.)

Moreover, Father never provided proof of attendance at either Al-Anon meetings or a 12-Step program in defiance of the court's order, because he did not believe he needed such programs or had a problem. In light of Father's failure to document his participation and attendance, the trial court was not obliged to accept his testimony at the hearing that he had begun attending a weekly 12-step meeting.

2. *Clear and convincing evidence supports the court's dispositional orders.*

Before a court may order a minor physically removed from his or her parent, the court must find by clear and convincing evidence that the minor would be at substantial risk of harm if returned home, and no reasonable means exist to protect the minor without removal. (§ 361, subd. (c)(1); *In re T.V.* (2013) 217 Cal.App.4th 126, 135.) " 'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]' [Citation.]" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

18

Although the juvenile court must make the removal findings by clear and convincing evidence, on appeal " ' " 'the clear and convincing evidence test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' [Citation.]" [Citation.]' " (*In re K.A.* (2011) 201 Cal.App.4th 905, 909.)  We review the court's dispositional findings for substantial evidence.  (*In re T.V., supra,* 217 Cal.App.4th at p. 136; *In re Lana S*. (2012) 207 Cal.App.4th 94, 105; *In re N.M*. (2011) 197 Cal.App.4th 159, 170.)

Father argues that the evidence showed he and Mrs. Y. were providing a loving home for Joshua.  When the Department's social workers made their unannounced visit, they found the home clean and organized, and Joshua well cared for.  Mrs. Y. had assumed care of Joshua and there were no issues regarding her fitness to care for him.  However, the evidence we have discussed *ante* supported the court's dispositional order.  There was evidence Father was still allowing Mother to supervise Joshua or have unmonitored visits with him; and Father failed to show he was attending an appropriate alcohol program, did not recognize he had any issues with alcohol use, and became intoxicated while supervising Joshua.  For the same reasons we have stated affirming the juvenile court's jurisdiction over Joshua, we affirm the court's removal order.

DISPOSITION

The orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.